UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 01-976 (DSD/SRN)

Yusuf Adam,

Plaintiff,

v.

**ORDER**

First Contact Inc.,

Defendant

John A. Klassen, Esq., Neaton, Puklich and Klassen, 601 Carlson Parkway, Suite 620, Minnetonka, MN 55305, counsel for plaintiff.

John J. McDonald, Esq., Bradley Lindeman, Esq., Meagher and Geer, P.L.L.P., 4200 Multifoods Tower, 33 South Sixth Street, Minneapolis, MN 55402, counsel for defendant.

This matter is before the court on defendant's motion for summary judgment [Doc. No. 19]. Based on a review of the file, record, and proceedings herein, the court grants defendant's motion.

**BACKGROUND**

Plaintiff Yusuf Adam ("Adam") filed this employment discrimination case against his former employer, First Contact, Inc. ("First Contact"), alleging that he was fired because of his national origin.

FILED 8-12-02
FRANCIS E. DOSAL, CLERK
Judgment Ent'd. 8-12-02
Deputy Clerk's Initials

Adam is a black male from Somalia who moved to the United States in 1996, and the State of Minnesota in 1998. When he arrived in Minnesota, he contacted a temporary employment agency and was placed with defendant First Contact. At First Contact, Adam answered incoming telephone calls assisting cellular telephone customers with billing questions. After approximately one and one-half months, Adam was offered permanent employment with First Contact. His position was a customer care consultant.

Customer care consultants worked in the call center at First Contact. The call center had over 200 telephone consultants. In order to monitor the quality of the consultant's work, First Contact's quality assurance department monitored the phone calls to the consultants. The quality assurance department was a separate department at First Contact. Adam knew that his telephone calls would be periodically monitored.

In addition to random phone monitoring, First Contact also had access to a variety of statistics that were generated by the computer system distributing calls at First Contact. One report showed each consultant's work on a particular shift broken into one-half hour intervals.

A second report showed details of each particular phone call that an agent handled. These reports showed if a customer hung up while placed on hold by noting "caller abandoned from hold." If the consultant terminated the call, the report would state "agent

released." Transfers were also noted. These reports reflected the total time that a consultant spoke with a customer as "talk time." These reports were generated automatically through the telephone login system.

Finally, First Contact's clients had the ability to directly monitor the telephone calls. Typically, when this occurred, a report would be prepared by First Contact's particular client. These reports indicated if the consultant was handling calls consistent with the client's particular protocol requirements. These reports were prepared outside of the First Contact facility.

Plaintiff was reprimanded periodically for deviations in the required quality of telephone services he was providing from August 1999 until his termination in August 2000. For example, on August 12, 1999, Adam received a written warning from his supervisor for placing a customer on hold before he said anything to the customer. This write-up was generated by the quality assurance department. Plaintiff admits that he engaged in this behavior but refused to sign the warning because he did not believe that his conduct was wrong.[1]

Although plaintiff received a warning from his supervisor indicating that it was inappropriate to place a customer on hold without first answering the call, Adam continued to engage in this

---

[1] Plaintiff's manager at the time when this event occurred testified that this behavior was unacceptable. (Romero-Bullard Dep. at 44, 80.)

conduct. (See Adam Dep. at 107, 174-175; Romero-Bullard Dep. at 79-80.) On September 20, 1999, Adam was again reprimanded for the same behavior. (Adam Dep. at 101; Klassen Aff. Ex. 25.) He was warned that if it occurred again he would be terminated. (Klassen Aff. Ex. 25.)

In response to the warnings, plaintiff sought a transfer. Nine days later he was transferred to an "outbound" department where the agents called customers rather than receiving calls. Subsequently, plaintiff requested a transfer back to the incoming calls unit. This request was granted and he was transferred back to his former unit.

In December 1999, Adam received reprimands for failing corporate monitors. (See Adam Dep. at 120-122; Lindeman Aff. Exs. O & P.) On June 12, 2000, plaintiff was again reprimanded for "dropping calls." (Adam Dep. 168-169; Klassen Aff. Ex. 26.) Telephone records confirmed that calls were being dropped or that plaintiff hung up on the customer. (Klassen Aff. Ex. 26; Adam Dep. 192; 199; & Ex. G.) In addition, plaintiff's supervisor wrote that he observed plaintiff during his shift reading a newspaper rather than answering calls. (Adam Dep. at 169; Klassen Aff. Ex. 26.) Plaintiff admits that he was reading a newspaper but challenges whether it was improper. (Adam Dep. at 169.)

On July 13, 2000, the monitoring of plaintiff's telephone calls again revealed that he was dropping calls. (Klassen Aff. Ex.

27; Adam Dep. at 194.) Accordingly, plaintiff was reprimanded and told that if he was found dropping calls again, he would be terminated. (Klassen Aff. Ex. 27.)

On August 14, 2000, while plaintiff was working, a lead consultant asked plaintiff to change seats because she believed that plaintiff was spending too much time talking to other employees instead of working. (Anderson Dep. at 72-73.) Plaintiff refused to move. (Id.) In response, the lead consultant went to the supervisor on duty and told him that plaintiff refused to follow her instruction. (Id. at 83.) The supervisor approached Adam and asked him to move. (Id. at 73.) Plaintiff again refused and the two engaged in a heated exchange of words. (Adam Dep. at 215-216.) According to plaintiff, the supervisor grabbed him by the hand and told him if he did not leave he would call the police. (Id. at 216.) The supervisor then called his supervisor and asked her what he should do. (Anderson Dep. at 78.) That supervisor told him not to call the police. (Lambrecht Dep. at 27.) While he was on the telephone, plaintiff left the facility. (Anderson Dep. at 84.)

When plaintiff reported for work the following day, August 15, 2000, he complained to the human resources department. (Adam Dep. at 216.) During that meeting with human resources, plaintiff does not recall complaining that he felt discriminated against because of his national origin. (Adam Dep. at 236, 279-280.) The human

resources contact person also states that at no time during that meeting did plaintiff complain that his supervisor's conduct was motivated by or occurred due to plaintiff's national origin. (Wood Aff. ¶ 5.)

On August 16, 2000, the call center manager on duty was informed by the quality assurance department that several of her employees were again dropping calls. (Lambrecht Dep. at 5-7.) She took several printouts documenting dropped calls and began seeking the offending employees to discuss the call dropping problem with them. (Id.) After attempting to speak with two employees who had already left for the day, she approached plaintiff. (Id.) She immediately noticed that, although plaintiff was acting as if he were taking phone calls, his telephone cords were not connected. (Id.; Klassen Aff. Exs. 28 & 29.) She confronted him, and he denied knowing that the cords were not connected. (Adam Dep. at 219.) The supervisor then contacted another supervisor on duty to witness the condition of plaintiff's phone system. (Lambrecht Dep. at 9-10.) The supervisor and plaintiff proceeded to a conference room where plaintiff was confronted about the disconnected telephone cords and the documented dropped calls. (Adam Dep. at 219.) Plaintiff did not deny that he had dropped calls but stated that the call dropping was accidental. (Id. at 234.) He then told the supervisor to "do what you have to do." (Id. at 219-220.) The supervisor terminated plaintiff's employment. (Id.)

Plaintiff now brings suit under Title VII and the Minnesota Human Rights Act ("MHRA") alleging that he was discriminated against because of his national origin[2] and further claims that he was terminated in retaliation for complaints made to his employer. After carefully reviewing the record, the court will grant defendant's motion for summary judgment and dismisses plaintiff's claims with prejudice.

## DISCUSSION

### A. Standard of Review

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating to the court that no genuine issue of material fact exists. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A fact is material only when its resolution affects the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 250.

On a motion for summary judgment, the court views the evidence in a light most favorable to the nonmoving party, giving that party

---

[2] Plaintiff conceded during the oral argument hearing that he was bringing no claim based on his race.

the benefit of all reasonable inferences without assessing credibility. See Miller v. Nat'l Cas. Co., 61 F.3d 627, 628 (8th Cir. 1995). The Eighth Circuit Court of Appeals has counseled that "summary judgment should seldom be used in employment-discrimination cases." Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994). However, the nonmoving party may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a party cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. See id. at 322-23. With this standard at hand, the court considers Metro's motion for summary judgment.

**B. Plaintiff Fails To Present A Prima Facie Case**

Whether brought under Title VII or the MHRA, Adam's ethnic origin discrimination claim is analyzed under the framework of McDonnell Douglas v. Green, 411 U.S. 792 (1973). See Sigurdson v. Isanti County, 386 N.W.2d 715, 719 (Minn. 1986). A plaintiff must first present a prima facie case of ethnic origin discrimination: that he was a member of a protected class, that he was qualified for the position, and that despite his qualification he was displaced from the position. See Rose-Maston v. NME Hosp., Inc., 133 F.3d 1104, 1108 (8th Cir. 1988). If he meets his prima facie

burden, a rebuttable presumption of discrimination arises. See id. at 1107. However, the defendant may rebut plaintiff's prima facie case by demonstrating a legitimate, nondiscriminatory reason for adverse action against plaintiff. See id. Once the defendant articulates such a reason, the presumption of discrimination disappears and the plaintiff bears the burden of proving that the employer's proffered reason is merely a pretext for discriminatory animus. See id.

In this case, since Adam fails to establish a prima facie case on his discrimination claims of hostile work environment, disparate treatment, and retaliation and reprisal, the court will grant defendant's motion for summary judgment.

**1. Hostile Work Environment**

A hostile work environment exists for the purpose of the anti-discrimination statutes "when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the condition of the victim's employment and create an abusive working environment.'" Palesch v. Missouri Comm'n on Human Rights, 233 F.3d 560, 566 (8th Cir. 2000)(quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). The harassment must be sufficient to create an objectively hostile environment. Id. at 566. In order to establish that the

harassment is motivated by discriminatory animus, the plaintiff must allege more than conclusory allegations that the actor was motivated by impermissible factors. Id. at 567.

Here, as evidence of a hostile work environment, plaintiff alleges that the reprimands and scrutiny directed towards him by his supervisors changed the conditions of his employment. However, Adam misunderstands the requirements to establish a discriminatory hostile environment. The environment must be hostile due to the overt discrimination regarding his national origin in the workplace.

To the contrary, plaintiff repeatedly testifies that he never heard any person employed at First Contact refer to Somalians in a negative or derogatory manner. (See Adam Dep. at 87-88, 153-154, 211, 225, 234-235, 280-281.) Plaintiff presents nothing more than allegations and speculation that defendant's conduct was motivated by discriminatory animus relating to his national origin.[3] Accordingly, the court concludes that he cannot establish that he was subjected to a discriminatory hostile environment. See Bradley

[3] The testimony of Mursal Abakar does not provide a basis for inferring discrimination since Abakar never worked at First Contact with plaintiff or at the same time that he was employed. (Abakar Dep. 4, 20-21; Abakar Aff. ¶ 2.) Similarly, the testimony of Roha Abdulle is inadmissible hearsay since she was not actually present when the comments that purportedly support plaintiff's claims were made. (Abdulle Dep. at 21.)

v. Widnall, 232 F.3d 626, 632 (8th Cir. 2000) (holding that plaintiff failed to establish claim of hostile environment based on her own speculation as to alleged harasser's motivation).

**2. Failure to Promote and Disparate Treatment**

In order to sustain a failure to promote claim, a plaintiff must show that: (1) he was a member of a protected group; (2) he was qualified for a promotion to a position for which the employers was seeking applicants; (3) he was not promoted; and (4) similarly situated employees, not part of the protected group, were promoted instead. Austin v. Minnesota Mining & Mfg., Inc., 193 F.3d 992, 994-995 (8th Cir. 1999).

Adam's claim fails on two bases: first, Adam does not establish that he was qualified for promotion since he was not meeting his employer's legitimate performance expectations; and second, he fails to establish that similarly situated employees, not part of the protected group, were promoted instead of him.

Qualified for the purposes of a prima facie case requires that the employee must demonstrate that he was actually performing his job at a level that met the employer's legitimate expectations. See Whitley v. Peer Sys. Inc., 221 F.3d 1053, 1055 (8th Cir. 2000)(citing Miller v. Citizens Sec. Group, Inc., 116 F.3d 343, 346 (8th Cir. 1997)). Adam's performance evaluations show a history of poor performance and that he was not meeting First Contact's legitimate expectations. For example, over the course of his

employment Adam was reprimanded on numerous occasions for various infractions relating to his job performance. (See, e.g., Klassen Aff. Exs. 6, 26-28; Paukert Aff. ¶ 2 ("I observed [Adam] reading a newspaper while sitting at his work station. When I approached him, I observed that no account was active on his computer screen, and a customer was on hold on his telephone.").)

On the record before the court, no reasonable jury could conclude that Adam was qualified for promotion or even work as a customer consultant. See Richmond v. Bd. of Regents, 957 F.2d 595, 598 (8th Cir. 1992) (affirming trial court's conclusion that plaintiff had not met her prima facie burden where defendants produced abundant documentation, covering approximately eighteen months, that plaintiff's performance was unsatisfactory, that plaintiff ignored progressive warnings and discipline, and that plaintiff's performance did not improve).[4]

Adam also fails to present any admissible evidence that his ethnicity had anything to do with the way defendant promoted its employees or applied its workplace policies. See Runyon, 218 F.3d at 918; Schoffstall v. Henderson, 223 F.3d 818, 826 (8th Cir. 2000).

---

[4] While Adam's attempts to offer the testimony of co-workers suggesting that he was a good candidate for promotion, none of those employees was in a position that had responsibility for evaluating and directly promoting applicants. Therefore, they have no foundation to testify as to the relevant standards for promotion as they may have applied to plaintiff.

That is, Adam fails to demonstrate that he was treated differently than any similarly situated non-Somalian employees.[5]

Moreover, the record demonstrates that plaintiff was reprimanded based on data that was compiled by a facially neutral computerized monitoring system. Adam does not allege that these neutral reports were altered or fabricated. The court sees no other basis in the record to support plaintiff's assertion, or to create an issue of material fact regarding his allegations of disparate treatment.

Based upon the foregoing, the court concludes that plaintiff has failed to establish a prima facie case of discrimination as it

---

[5] In order to establish a prima facie case of failure to promote, plaintiff must establish that he was treated differently than similarly situated employees. Lynn v. Deaconess Med. Ctr., 160 F.3d 484, 487 (8th Cir. 1998). While Adam offers a sampling of documents from supervisory personnel files trying to suggest that defendant had a pattern and practice of ignoring performance deficiencies on non-Somalian employees, the court finds this evidence to be insufficient to defeat summary judgment since he cannot document performance deficiencies that are comparable to plaintiff or that pertain to similarly situated employees. See Griffin v. Super Valu, 218 F.3d 869, 871-72 (8th Cir. 2000). For example, Adam points to the personnel file of Lewia Flourny, an employee with a performance record similar to his own. However, Flourny was promoted after nearly five years of employment, more than twice the length of plaintiff's employment. Additionally, he does not establish that any of the persons he references worked in the same department or reported to the same supervisors from which he sought promotion. For example, John Kiesling, Lewia Flourney, Craig Lewandowski, and K. Porter-Pearson all worked in departments distinct from plaintiff and under a different management staff. (See Klassen Aff. Ex. 19.) When employment decisions are made by differing decision-makers, the employees are not similarly situated to establish discriminatory animus. See Jones v. Frank, 973 F.2d 673, 676 (8th Cir. 1992) (quoting Timms v. Frank, 953 F.2d 281, 286 (7th Cir. 1992)).

relates to his allegations of failure to promote and disparate treatment.

### 3. Retaliation and Reprisal

Plaintiff also fails to establish retaliation. In order to establish a prima facie case of retaliation, plaintiff must show that: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the adverse action and his protected conduct. See Cross v. Cleaver, 142 F.3d 1059, 1071 (8th Cir. 1998); Evans v. T. W. Services, Inc., 930 F.2d 612, 614 (8th Cir. 1991).

Here, plaintiff fails to establish the first and third elements of his prima facie case of retaliation. There is no indication in the record that plaintiff ever specifically complained to his employer about alleged national origin based discrimination. (See Adam Dep. at 105-106, 154, 156, 177, 210, 279-280; Wood Aff. ¶ 7.) Plaintiff does not remember mentioning that the alleged offensive conduct against him was motivated by or occurred due to his national origin when he met with Heidi Wood, the human resources specialist, on August 15, 2000, to complain about the incident that occurred on August 14, 2000. (See Adam Dep. at 236.) Ms. Wood agrees with Adam's recollection of the August 15, 2000 meeting and specifically provides testimony that, "[a]t no time did Mr. Adam complain that [his supervisor's] conduct was motivated or occurred due to [his] race or national origin."

(Wood Aff. ¶ 5 & 7.) Therefore, he has failed to establish that he engaged in statutorily protected activity, and his retaliation claim against defendant must be dismissed.

Plaintiff also fails to establish any connection between his complaint on August 15, 2000 and his termination on August 16, 2000. The record fully supports a conclusion that plaintiff's termination was based on the objective records documenting his recurring performance deficiencies, which began as early as August 1999, one year before his termination. (See Paukert Aff. ¶ 2 - 3; Lindeman Aff. Exs. M—T.) Moreover, immediately before he was discharged, when plaintiff's supervisor went to confront plaintiff about his continuing practice of dropping calls, she observed that his telephone headset was not properly attached and that he was not following the proper protocol in responding to customers. (Lambrecht Dep. at 6, 15-16.) She confronted plaintiff who denied that he had been dropping calls, and she showed plaintiff the telephone logs which verified that he had dropped calls. (Id. at 11, 16-18.)

Thus, the record before the court conclusively establishes that Adam was terminated for his own behavior that was unrelated to the August 14, 2000 incident or his August 15, 2000 complaint to First Contact's human resources generalist. See Smith v. Ashland, Inc., 250 F.3d 1167, 1173-74 (8th Cir. 2001); Kneibert v. Thomson Newspapers, 129 F.3d 444, 455 (8th Cir. 1997) ("[s]imply filing a

discrimination charge does not 'clothe the complainant with immunity for past and present inadequacies, [and] unsatisfactory performance.'" (quoting Jackson v. St. Joseph State Hosp., 840 F.2d 1387, 1391 (8th Cir. 1988)).

Accordingly, the court concludes that plaintiff has failed to make out his prima facie retaliation case.

**C. Plaintiff Fails To Establish Pretext**

Moreover, even if plaintiff could establish a prima facie case, he has failed to present sufficient evidence to support a reasonable inference of discriminatory animus or pretext. Defendant had legitimate, nondiscriminatory reasons for an adverse action against plaintiff. As has been discussed, it is well-documented in the record before the court that Adam's employment ended because of his own poor performance. Adam implies that defendant did not properly follow its policies as applied to him because of his ethnic origin, but there is no evidence to suggest that First Contact's employment policies were interpreted differently for Adam than for non-Somalian employees. Thus, Adam's claim does not support an inference of pretext. See Floyd v. State of Missouri Dep't of Soc. Serv., 188 F.3d 932, 937 (8th Cir. 1999) (departure from policy affected all candidates, not only plaintiff).

**CONCLUSION**

Based on Adam's failure to meet his prima facie burden or to establish that First Contact's asserted reason for termination was pretextual, defendant is entitled to summary judgment as a matter of law. Accordingly, **IT IS HEREBY ORDERED** that defendant's motion for summary judgment [Doc. No. 19] is granted and plaintiff's complaint is dismissed with prejudice.

**LET THE JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: August 12, 2002

David S. Doty, Judge
United States District Court

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

**DATE MAILED TO COUNSEL/PRO SE PARTIES:**

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*

Forms/8thcircuitprehearingconf.wpd